Good morning. May it please the Court, my name is Martha Hall. I represent Sandra Bates and my co-counsel, Holly Hannibal, represents Wesley Bates. This is a consolidated appeal and we were both going to argue on this case. I would like to take the first three to four minutes to address the final issue in the opening brief, which is the District Court's refusal to authorize the expert to assist counsel in analyzing the quantity of methamphetamine that could have been manufactured with the iodine issue. Wasn't it too late? I mean, she waived that opportunity. Well, the whole issue that we were appointed to represent her on was a motion to withdraw the guilty plea and embedded... And if that fails, then she's waived any opportunity to bring in a toxicologist, hasn't she? Well, the problem is, is that as part and parcel of her motion to withdraw, the District Court was allowing the defendants to make arguments about ineffective assistance of counsel. And specifically at the time of sentencing, the District Court said issues on ineffectiveness, jurisdiction, and issues related to the motions to withdraw the guilty plea are preserved for appeal. They're not waived. The government accepted that and did not object to those limitations on the waiver. But our argument is that she was told she might get 20 to life, and she wants to show that there was no way she could get 20 to life. That's correct. She wants... How do you deal with all of that iodine they sold to third parties? I mean, that's the big gorilla there, right? The big gorilla, that's correct. The big gorilla is the amount... It would do you no good to have an expert if you include that quantity, right? That's correct. That's 133, I believe, 133 kilograms. It doesn't matter what your expert says. You're going to get more than, if you include that quantity, you're going to get more than enough for the 20 to life. So there's no prejudice, even if you follow your argument? I believe that Judge Kozinski said if we include that. Tell me why you don't include that. That's based on solely inventories, inventories taken from subpoenas from the suppliers of iodine, iodine which is legally sold for use in livestock and pet care businesses. They have no evidence of how that iodine was used. In other words, the only evidence about the sale of this iodine is the inventory and the sales slip. We don't know to whom it was sold. We don't know how it was used. We do have evidence that they were pretty loose and free about talking about methamphetamine production. To the agent? To the undercover agent? Yes. Right. And one jury could infer from that that they didn't limit such talk to the agents and that the sort of substantial quantity of iodine they sold reflected sale for purposes of dog manufacture. Under the aiding and abetting charge, though, it was charged as an aiding and abetting and the government I thought it was conspiracy. It's an odd charge. It's like several layers of inchoacy there. It's aiding and abetting a conspiracy to manufacture methamphetamine. Okay. And this was sort of an unknown set of conspirators. Yeah. We don't even know if anyone ever produced methamphetamine. There was no methamphetamine, no methamphetamine lab, no — Let me see you advising a client on a guilty plea in this very situation. What do you tell her? I mean, you say there's no theoretical possibility that you could get more than 10 years? No, you don't tell her that. But what we have is a — What do you tell her? I think you give her your best advice as to what the possibilities and probabilities are. You have to admit that there's always the possibility that things can go very far south. But the question is, what are the probabilities? And the question is, how do you frame it and how much — how much pressure is applied? I know that the government and the court took issue with the fact that I said that there was pressure applied, but I think that the description of the attorneys, if we discount some of the defensiveness on the part of some of the attorneys, they're talking to the defendants, they're telling them that the government has a very strong case, they're talking about the potential sentences on the greater charge, and they're talking about what that will mean for their son. They did have a very strong case, at least on the lesser charge. Yes, but that's what they pled to, and they pled to a range of 97 to 121 months, which is up at the top of the guidelines. So — With a recommendation of 97. With a government recommendation of 97, but the range is at the top of the — is at the top of the statutory max. It's not very far from that statutory max. But if you're looking at the potential of 20 to life, that's a lot more — that's a lot of time you're arguing. I mean, so — It's got to be a very — What you're quibbling about or arguing with is whether counsel was sufficiently emphatic in discounting the risk of 20 to life. I mean, that's really what we're getting down to. You agree that counsel would have been negligent or committed a malpractice if they — if she hadn't mentioned 20 to life as a possibility. Right, but the problem is — You agree with that, right? I do agree with that. I do agree with that. And so what you're saying is you mention it, and, of course, the client hears 20 to life, and that has a life-altering effect on people, you know, because that's the rest of your life in prison, maybe. And then you think counsel has a responsibility to say, but look, honey, this is not — you know, don't worry about it. This is very unlikely. The government — you know, it would be a fluke if the government could prove this. Well, I think that counsel has a duty to say, look, this is what the government is saying that they can prove. This is what they think that they can prove, and this is what they're going to ask for. But we think that we have some very good arguments to counter that, because here is what they would have to prove in order to get that 20 years. They need to prove that — I mean, I believe under the case law that they have to prove that the crime of the manufacture of methamphetamine with that iodine was committed. And to me, I see no evidence that they could present at all to prove that someone had manufactured methamphetamine with the iodine sold by the Bateses. And that because they can't prove that — Part of the problem is we have no idea. In fact, there's nothing at all about what a normal run of iodine sales would look like. I don't know if you have a sort of cattle farm. Do you buy three ounces of iodine for your herd to, you know, put in the water? Or do you buy a pound every six months? Or do you buy 15 pounds? I mean, I haven't — there's nothing in the record to tell us that. Whether selling — what was the quantity here over the years, 133 pounds of iodine? Right. I think 133 cubic. Is that sort of out of line with what other feed stores of that size sell? I mean, I'm — Well, I have several — I have several responses. One is that this discussion should really take place before the district judge, with the defendants having the opportunity to have an expert who could analyze the evidence, discuss the evidence with the defendants. We're talking about an expert that you asked for. I mean, this is a whole argument is we want an expert that will tell us whether or not you could extract as much as 5 kilograms or 5 kilograms, I guess, of methamphetamine from the iodine. Okay? So that's the kind of expert you want. The kind of expert that will tell us, given a given quantity of iodine, how much meth can you get out of it. We are now on a wholly different subject, and that is the subject of how much is somebody likely to sell in a normal feed store over the course of several years, or how many of those things are likely to be legitimate sales. Nothing was introduced on that point. I have no idea what it is. No expert was requested for that kind of evidence. And without that evidence, your expert that you did ask for, you know, has nothing useful to say. I actually, I do notice that I'm using up all my co-counsel's time, and I do want to. She's grateful. I can tell. But I, I mean, I believe that based on the law, even if we don't have any experts, that the government could not present sufficient evidence to prove the aiding and abetting, because it is their burden, it is their burden to prove that the crime was committed. If the government comes in and says, look, we've got feed stores all over the country that do this kind of volume of business, and over the course of this time, none of them have sold more than 10 pounds of iodine, because iodine is a quantity that's sold in one- and two-ounce quantities at the most, even for large farms, just because it's, you know. And then these people sell 133 pounds over that period. I think a jury could be persuaded that those sales were illegitimate. And I think at that point, you would be looking at substantial risk of turning to life. I don't believe that that would really be proof beyond a reasonable doubt sufficient to satisfy all the factors that need to be proved for an aiding and abetting. Sure. If a jury came back with a verdict, there would be substantial evidence there to support it. The factors for aiding and abetting, though, require that there's some evidence that the crime was actually committed. What you're referring to is something that would raise the suspicion, maybe a probability that some unknown person could have manufactured methamphetamine with this iodine. But is that sufficient to prove beyond a reasonable doubt the element that the crime of manufacture of methamphetamine was committed with the iodine sold by the Bateses? Probably why the government offered the sweetheart deal. I beg to differ with the Court on whether it was a sweetheart deal to the extent of the ---- Eight years for the ---- my gosh. Eight years, which was close to the statutory max of 10 years. I think they did have a very good case on the sale of iodine with the knowledge. I believe that they could have gotten a conviction for sale of iodine with either reckless disregard or knowledge that it was going to be used to manufacture methamphetamine, even on the larger quantity. But as to the specific intent in aiding and abetting the manufacture of methamphetamine, I think it's different. I just ask, do you think that she, Mrs. Bates, waived her right to appeal in the plea agreement? What's your position on it? Yes or no? She said there wasn't a plea agreement. She waived all the rights to appeal. No, because she made her motion to withdraw her plea prior to sentencing, and at the time of sentencing, the judge specifically stated and the government acquiesced that she preserved her right to appeal issues related to jurisdiction, ineffective assistance of counsel and the motions to withdraw the plea. And that's quoted in the reply brief where the judge and the prosecutor had an exchange about the right to appeal. We'll give you a couple of minutes to argue. Thank you. Good morning, Your Honors. May it please the Court. My name is Holly Hanover, and I represent Wesley Bates in this matter. I would ask for approximately 3 to 4 minutes for argument and 2 minutes for both of us to rebut, if that's all right with the Court. I'll be arguing the issue that the government lacked jurisdiction to prosecute Wesley and Sanford Bates because the States have jurisdiction over offenses that are committed on Indian land. And why do you say on page 3 of your brief the district court had jurisdiction under 18 U.S.C. 3231? That's as far as being able to make the argument that there is no jurisdiction, Your Honor. We have to be able to talk to someone about it, and the district court here is the only person, the only court in front of us, and we have to make the argument before them. The government accuses you of misciting the Bruce case, leaving out some very important language such as Federal criminal laws of general nationwide applicability apply to Indians unless a treaty exempts them. Why did you leave out that sentence? Because in this particular case, the Bruce case dealt with the statutes of 1152 and 1153. Why did you leave out that sentence? It didn't pertain to the McBratney case as it related to that particular point, Your Honor. What it related to was the statutes that were being applied under 1152 and 1153. And those statutes are applied to you. And why did you quote the Bruce case at all? Because the Bruce case stands for the proposition, and it reiterated what was cited in the Martin case that stated specifically, and I'll quote this, that States retain exclusive jurisdiction over general crimes committed by non-Indians against non-Indians in Indian country. It never stated that it included enclave crimes. It stated specifically general crimes. So your position is that Federal laws of general applicability, like the drug laws, apply everywhere in the United States and its territories, and they're applying in Guam, they're applying in Saipan, they're applying in Puerto Rico, they apply in every State of the Union, but they don't apply in Indian country because their State law comes. That's your position? That's the McBratney position. In general, Federal law. I don't think that's the McBratney position, but that's your position. That is the general one. It is the general one. So all of the laws having to do with drugs or antitrust law or bank fraud or bank robbery, all of the body of Federal criminal law that applies nationwide everywhere, coast-to-coast, sea-to-shiny-sea, does not apply in Indian country. That is the general rule that Federal law encompasses jurisdiction within those territories. But McBratney ---- You cannot be believing that. I mean, I know you must feel you have to argue, but I can't believe that you really believe that. Well, I do believe it because McBratney lays out a very specific exception that occurs within Indian territory and involves non-Indians committing a crime against other non-Indians. It lays out that very specific exception. Well, the Bateses seem to be chameleons. They're Indians in one court and not Indians in another court. I mean, the representations that are being made in this case are just too loose to believe. Well, the problem with this case, Your Honor, is that there were no facts laid out to support that specifically Sandra Bates, I believe, is what you're referring to. Right. She was never established to be an Indian. There was a contention, but I believe that the case law states that there has to be a crime offense showing at some level to support the fact that she was an Indian. And in this particular case, there never was that showing. At some point, you have to deal in the realities of what the case is all about. You can't just take flights of fancy. And what's been done with her and whether she's an Indian or not is a flight of fancy. And that could be a determination that could be done by the district court after this case is remanded, Your Honor. I believe that it would not be established that she would be an Indian because there are no facts to support it. Okay. Thank you. Thank you. Well, I'm just questioning, is she an Indian or a non-Indian, from your perspective? Our position is that she's not an Indian. She's a non-Indian. Okay. Thank you. May it please the Court. Peter Kuff of the United States. I believe the Court understands our position on the jurisdictional issue. I just want to address a few of the comments that were made concerning the expert funds. Initially, the charge that was in the indictment was not aiding and abetting a conspiracy to manufacture methamphetamine. It was not a substantive offense of aiding and abetting something. It was a charge of conspiracy to aid and abet, which is a different offense. The offense is a conspiracy. There does not need to be proof of the underlying manufacture. Ms. Hall made some points about whether or not we could prove that charge. I frankly disagree with her, but whether or not we could is irrelevant to the issue of whether or not the Court properly denied the application for expert funds because whether or not there was sufficient evidence. If it is impossible that you could prove it or, you know, so highly unlikely that no rational lawyer would think that's a serious risk, then wouldn't defense counsel have had a responsibility to say, look, there is a theoretical possibility because they've charged you with this crime that you might get 20 to life, but as a lawyer, you know, here are all the things that have to prove, and, you know, I don't think that that is something that you need to worry about very seriously. It's possible, but highly unlikely. Absolutely, counsel would have a responsibility to tell their client that, but that There's no indication that that happened. That they told their clients the government's not going to be able to prove that? Right. No, there's nothing explicit in the record concerning that point. So we have to sort of assume that this is a situation where there was a fair possibility that the government could prove that to a jury. That they advised their clients there was a fair possibility the government could prove it? That's what they advised their clients, and, in fact, it's true. That's reflected the real risks of not accepting the plea bargain. That is correct. However, How would you prove that? I mean, these are sales to unknown parties over a period of a long time. You know, 133 pounds doesn't just off the top of my head strike me as, you know, a large amount if you're selling to cattle farms and horse farms, and they put iodine in the water to treat. I think it has medicinal uses, right? It does. I mean, we take iodine out of salt, right? It's not the same iodine, sir. No? No. These are iodine crystals. Well, it's the same element. You know, it has some beneficial uses. Yes, but iodine crystals have a very narrow use. They don't give it to cows for cavities, but, you know. So I don't know how much you would expect a feed store like this to sell over the course of time. Actually, I believe, I couldn't find it in the pre-sentence report, but I'm reasonably certain it's in the pre-sentence report that there was a proffer, at least in a search warrant affidavit that was in the record, that a normal person, a normal, for example, pet owner who purchased, or rancher who purchased iodine crystals would use a two-ounce jar, take them about a year, I think was the representation. So there was slight evidence in the record concerning that. As far as your question of how would we prove it, it would be the combination of their actions during the undercover purchases, their statements to the undercover officers, the fact that they were warned twice concerning the illegal uses, the prices that they were charging which were exorbitant. What the jury would have to find beyond a reasonable doubt in order to convict on the second offense and expose them to the 20th of July is that they made sales to third parties for all or most of the 133 pounds that were non-legitimate sales. There were sales that they knew would be used for methamphetamine manufacture. That's what the government would have had to say. Essentially, yes, although I don't know if I agree that we'd have to show for most of the 133 pounds. We would have to show the conspiracy to aid and abet the manufacture of at least 500 grams of methamphetamine in order to get the 10-year mandatory minimum, but I believe that's the only fact that we would have to submit to the jury. Then you get to your expert because there's substantial disagreement about how much you can extract out of iodine, whether it's 15% or 50%. You gave a bunch of internet stuff, but that's not evidence. Correct. So far we know it's 1% or 5%. So how close you get to the 133 pounds is significant, and the farther away you are from it, the more likely, the more important it becomes to have an expert who says, well, even if you sold 80 pounds, 80 pounds would not have produced 5 kilograms of the stuff, right? Well, yes, but though given the posture of the case, the defense had already admitted that all 295 pounds of iodine crystals were involved in the offense in their plea agreement. So any competent expert who comes in at that point is going to have to start his analysis from that point. He can't just ignore the 295 pounds. He's not going to be credible at that point once his clients have already admitted that. So we would have to use that 295. I think you're mistaken about that because this is in aid of withdrawing the plea. So the argument is, would be, I made the plea, I consented to the plea, because counsel overstated the risk of a 20-year life sentence. And the way we're going to deconstruct counsel's advice is by saying, well, how much could they prove they sold illegitimately? And then we're going to have an expert who will say, well, given what the reason we could have proven was sold illegitimately, you couldn't extract enough methamphetamine out of that to really have a significant risk of getting a 20-year life sentence. So I don't think they'd be expertly bound by their admission. I would respectfully disagree. I don't think that the fact that the client has admitted all 295 pounds of iodine. Explain that to me. If the admission is part of the very plea agreement that they're trying to set aside, how can you possibly, how can they possibly be bound by it? Well, he hasn't set aside the plea agreement yet. This is an expert who has to come in and analyze whether or not the prior counsel grossly mischaracterized. For purposes of deciding whether to set aside the plea agreement. Correct. But if he is going to, I'm sorry. So you can't assume the plea agreement is valid in making that assertion. Well, he has to, he would have to credibly start from his client's admissions concerning whether or not that amount of iodine was involved in the offense. And I don't believe, I mean, the client's decision whether or not to admit a fact. I don't think you mean that. I think I do, sir. With all due respect, I mean, if his client has admitted under oath. Before the plea agreement? As part of the plea agreement and during the plea colloquy. If his client has already admitted that fact and a post-guilty plea, an expert is to come in and analyze the amount of iodine that is involved in the offense. If that's the case, you can never set aside a guilty plea because you say, well, no matter what, you've got a confession. So we'll take the confession. I mean, you really can't mean that. I think you're misunderstanding. I think when you go back and you listen to the transcript of what you said here, you'll be embarrassed. I think we have a disconnect about what I'm trying to explain here. The issue is whether or not the district court abused its discretion denying the funds for the toxicologist. The only issue for which the toxicologist could have been brought in for was to examine the conversion rate from iodine to methamphetamine. Right. At that point, if he's going to come in and analyze that issue, he's going to have to credibly start his analysis from what the person has already admitted the offense involved. No. You're completely wrong about that. I respectfully disagree, sir. Well, why don't you explain to me why they'd have to assume that? The point is whether it was advice given by counsel in advising the client to take the guilty plea. Was that good advice or bad advice? That's advice that's given before the admission. So you have to go back to the point in time before the admission and say, given all the evidence on the table available at the time, not including the admission which came afterwards, was there enough evidence that the government could use to prove that at least 5 kilograms of methamphetamine would be produced? Sir, that's a separate issue from what the toxicologist was requested for. The toxicologist was the legal issue. I think you're mistaken about that. The toxicologist was requested in order to support the claim that counsel overstated the risk of a 20-year sentence. Actually, I don't believe that's the case. The toxicologist was requested to determine the conversion rate. The legal issue of whether or not we could have proven that amount, that's for the lawyer. That has nothing to do with the toxicologist. The toxicologist was only sought in order to determine the conversion rate. The conversion rate is part of the risk assessment. Correct. And it's a narrow part of it. But I don't think a toxicologist is competent to determine whether or not the evidence is sufficient to prove a criminal offense. That's not a toxicologist's area of specialty. It's only — Of course. But the lawyer is asking for information so that the lawyer can make the judgment. Correct. He's asking for that information about the conversion rate. That's all they were asking for was we needed a toxicologist in order to determine the conversion rate from iodine to methamphetamine in this case. I think you're terribly confused. What's the importance of the conversion rate? Their point was that 295 pounds of iodine or whatever amount of iodine that you wanted to convert down to methamphetamine would not have created the significantly higher sentence that supposedly the defense attorneys represented. You know, you and Mr. Hubachek should listen to this tape later, and he'll explain it to you. I just want to, before you close, the question is, did the counsel overstate the potential risk? And you started to give a list of why you thought they did. And I think you said the undercover admissions were significant in what you would do to verify that that risk exists, a risk of a conviction. Did you finish that list? I mean no. No, I didn't, sir. So the question I've written down here that I wanted to get at before I left is, did counsel overstate the potential risk facing the defendant? And you say they did not. Well, number one, we never know what, there's nothing in the record concerning what they told their clients about that risk. Well, I'm just, the potential exposure. Yes. She testified. Mrs. Bates testified. No, Mr. Bates testified. And they indicated that it was a significant exposure, and then her view is, but it really wasn't, I was misled. And you're saying, no, you weren't misled, there was a potential risk, and we would have obtained a conviction in this fashion because we have this evidence. And I was just trying to make a list of what the evidence was. Yes, sir. There was the amount of iodine that was involved, which was grossly more than any store would need. We've, I don't know this is in the record anywhere, so, I mean, you're talking about asking me to proffer our case, essentially, but there would have been the proof of the experts concerning how much iodine a legitimate pet store might sell, how much iodine was legitimately needed, the prices that they were charging, which were, I believe, in the order of 400 to 500 percent markup. There would have been the fact that they had an iodine crystallization lab in their backyard. What does that prove? I mean, I don't know. A legitimate purchaser of iodine would go to a supplier and purchase iodine crystals, if that's what you really wanted. I mean, there's no reason for people to manufacture iodine in their own backyard and expose their children to it, unless, for example, you don't want that getting out that you're purchasing large amounts of iodine. Well, what is the government hypothesis they were doing there? I mean, they could, in fact, and did purchase large amounts of iodine. What is this thing in the backyard supposed to have been doing? At that point, they had indicated to undercover officers, and I believe they might have indicated in their post-arrest statement, that they had had problems getting additional iodine from their suppliers because, for whatever reason, I don't know if their suppliers were cutting them off or they were starting to report them, whatever, but they had had problems getting additional iodine. So, they were starting to manufacture their own. They were making iodine? Making iodine crystals. They were converting tincture into iodine crystals. Oh, I see. Tincture into crystals. I see. Any other admissions? By the defendants? Yes. There were admissions, yes. I believe Ms. Bates admitted, if I recall correctly, that she probably knew it was being distributed to methamphetamine manufacturers. I don't believe Mr. Bates made admissions that explicit, although he admitted selling the iodine crystals. He admitted receiving the warnings and things of that nature. And to be perfectly candid, we had agreed. I can't recall which defendant off the top of my head at this point, but we had agreed we would not use one of their post-arrest statements at trial. You know, it bothers me when a lawyer says to be perfectly candid, because then I'm afraid if they haven't said that, everything else is questionable. I guess I should say in the interest of full disclosure then, because I want to make sure you understand that that would not have been part of our proof at trial, was one of their post-arrest statements. I'm not sure which one. I can't remember off the top of my head. Were you the trial attorney? I was one of them. Did you finish your list? I believe so. If there are no other further questions, I'll submit at this point. Thank you. You have a minute for rebuttal, if you wish. Your Honor, just a couple of points. On the issue of the jurisdiction, Mrs. Bates is presenting alternative and inconsistent positions on the jurisdiction, but she's permitted to do that. Under the Supreme Court, the defendants, criminal defendants, can present alternative and even conflicting defenses. So can she say, I'm Mrs. Bates? No, I'm not. I'm Mrs. Johnson. Well, she didn't go quite that far. I mean, this is, you know, from my point of view, this is ridiculous. Well, she did argue below. Her position below was that she was a Native American. Right. And could only be prosecuted by tribal courts. And now she can't. Right. Because she's not. Well, because she didn't have any evidence. Well. Now, the district court did. There comes a point when things become awfully fast and loose. I realize that that is certainly the way it appears. However, she wanted to take the advantage of both of the available jurisdictional arguments. There is clearly an argument from the record that she did not make a prima facie case that she was a Native American because she didn't have any evidence such as a membership of a tribe or even a testimony from family members to prove her Native American heritage. She wanted to make sure that she also joined in the alternative yet inconsistent argument on the jurisdictional issue. And then just my final point, Your Honors, as to all of the discussion about the district court and the Bateses should really have an opportunity to at least assess the type of advice that they received. So what do the Bateses want? Do they want to start all over again? They do want to withdraw their guilty plea. All the way. And run the risk of getting the kind of sentence that you know is out there. That's correct. That's been their position. And that's why they requested new counsel, so that they could make the arguments. So they could serve life. Well, they're hoping, they've been optimistic that the outcome will not be so severe. And I understand the Court's view of the evidence. However, I do believe that there is a very real distinction between the level of proof required to prove the 10-year maximum, that they knew that it was probably going to be used to manufacture methamphetamine or with reckless disregard. Their flight's not going to be held against them in any new trial. I'm sure it will be. I'm sure it will be. And I know that it was something that Judge Jones certainly considered. Unfortunately, my position is representative of Mrs. Bates. She's not a child, and I can't make her decisions for her. I can just try to do the best job. And part of doing the best job is assessing the real risk that she was facing. So as you would explain the risk to her, would you suggest the fact that she absconded would maybe be a factor that could, as the judge was considering all the totalities of factors, that could lead to even a more significant sentence than she potentially has now? Certainly. And she might be accused of threatening her. It's a position that we always face in difficult cases like this. That's the point. And it's not strickland to be stuck in the middle of these difficult situations. No, it's not. These are going to be situations that always arise. And there's no way to ensure that someone rationally considers all of the possibilities and all of the probabilities. There's no way to force someone to make those considerations. And so in our system, if they make that choice, it's their choice to make. And she's the one serving the time, not me. What reason do we have to find to set aside a plea? Fair and just. Actually, that's not quite the right answer. We have to find an abuse of discretion in the district court's failure to find a fair and just reason. Correct. And that's a considerably taller order for me to make. Correct. Okay. Thank you. The case is argued. We'll stand for a minute. We are adjourned.
judges: Kozinski, Trott, Beistline